# CIRCUIT COURT OF BALTIMORE CITY.

Filed August 14, 1928.

SIMON MICHLOVITZ, ET AL.,
VS.
EASTERN ROLLING MILL COMPANY, ET AL.

*Bartlett, Poe & Claggett* for plaintiffs.

*Haman, Cook, Chesnut & Markell* for defendants.

754

O'DUNNE, J.—(Orally immediately on conclusion of two days' argument).

I think this is a proper case to sustain the injunction and grant specific performance. My reasons for those conclusions are simply these: The case, to my mind at least, presents no difficulties. As the differential to Annapolis is slight, and the cargo is sufficiently weighty to warrant it, I think possibly the reasons for my conclusion might be of some value to the unsuccessful contendant, because they give him the additional advantage of picking out any flaw as to the conclusions the Court comes to.

The case is very simple. It is the tale of a wonderfully successful American enterprise of the steel industry. Mr. Aldred, the president of the Gas Company, and interested in bringing industries to Baltimore for the purpose of developing the community in which he cast his lot, together with a group of able associates, had a tin plate mill in operation, and the relations between Mr. Aldred and his associates and the Bethlehem Steel Company and the Gas Company were close and intimate, and the natural result was that on finding out the Bethlehem Steel Company was contemplating and desired to go into the tin plate business on a much larger scale—I think Mr. Clark said a plant was four times as large as theirs—it resulted in their selling out their plant to the Bethlehem Steel Company. If I am correct in my recollection of the testimony, at that time Mr. Jones was connected with the tin plate company. And as part of the terms of the sale they arranged for his (Jones') protection—they apparently looked on him as a valuable man and desired to do fair by him—that his contract with the Bethlehem Steel Company should be on terms satisfactory to himself and it was afterwards apparent that they were satisfactory to him. Then later, having sold out this tin plate industry to the Bethlehem Steel Company, this same group of financiers and manufacturers and capitalists conceived the idea, I think Mr. Aldred particularly, that a rolling mill, such as this, would be an industry well adapted to Baltimore's progress, and he arranged for the financing of such a mill, its capitalization, etc., providing they would find the right character of man familiar with the business and capable of manufacturing, and Mr. Clark says they found such a man in this Mr. Jones. I refer to Mr. J. M. Jones, who is now dead. Mr. Clark says he worked with him for many years and he took a trip some place and went out and investigated Jones' history and they decided he was just the man for the place, and they took him.

The record in this case shows that they made a special contract with him, having gotten, I suppose, a release from the Bethlehem Steel Company, where his activities were too circumscribed, because the purchasing of raw material was done for him, and the sale of the product was done for him, and he had no sufficient outlet for his ability. He was a manufacturer, and he could not manufacture under the conditions by which he was circumscribed at the Bethlehem Steel Company, and he, therefore, welcomed this outlet for his talent, and they welcomed the advent of his talent to this rolling mill, and the rolling mill, as it seems to me from this record, was partly capitalized on the very kind of man they had found in Jones. And they issued stock on the contract they made with him, together with the capital they put into the business, and made a special provision in the charter and in the by-laws, in recognition of this contract, and the authority that he had and the authority that the Board had to make these special long term contracts that have been referred to in this case, referred to in different ways, on one side, as I understand it, as a sort of evidence of the sinister character of the contract sued on, and on the other side, these long term service contracts with their officers or agents, are referred to for the purpose of showing that there was nothing unusual in the particular character of contract made by Jones that is in controversy in this case.

The company was wonderfully successful under the Jones management. He had in fact, as I would think from the description of the operations of

the company what might fairly be called plenary powers. Technically he was subject to the direction of the Board of Directors. Actually he was, I think, the corporation in the sense of the active, practical, efficient, dynamic force that produced the dividends. The extent of his success and activity is best shown by the statement of some of the witnesses that in the seven years of its operation, this Rollings Mills Company earned and paid over two and a half million dollars of dividends, and still have a large surplus, as I understand the record. So efficient and so capable, apparently, was Jones and so accurately had Mr. Aldred and Mr. Clark and the others sized him up, that they continued to recognize the extent of his ability by increasing his contract from the original $15,000 salary, if that is the correct figure, to $20,000, and at the time of his death they had just entered into an eight-year contract with him at $50,-000 a year salary, with a possible extra incentive, if that were necessary, of five per cent. commission on any surplus of the company in any year in excess of $475,000 net profits. The record says that the net profits did not at any time exceed that figure and therefore that commission contracted for was never earned.

Now, the operation of this plant is manufacturing from steel bars, purchased in fact from the Bethlehem Steel Company, the plant being located here according to the testimony of Mr. Clark largely because of the intimate relations between himself and the financial interests that he represented on the Board, because of its proximity to the Bethlehem Steel Company, and because of his close and working business relationship with the Bethlehem Steel Company, and because, from an inference in a statement made direct by Mr. Clark that they were a preferred customer of the Bethlehem Steel Company, an especially favorite customer.

The record shows that ninety-eight per cent. of the business of that company is the business of manufacturing a product they purchase from the Bethlehem Steel Company in the form of steel bars, into plates that are sold, through their sales agency, into the automobile market, and that in shaving off, for the purpose of trimming them down, there is "scrap," like wood

shavings in a carpenter shop, from wood. This is a "by-product" from the plant which under the less intelligent economic production of mills, was formerly thrown away to keep the plant clean, and under more intelligent economic administration, the by-products are sought to be conserved and marketed, but the fact remains that they have to be gotten out of the way because they are a refuse product, dirt around the mill, but dirt that has a commercial value, and if it did not have commercial value, and if there was not a market found for it, it would have to be thrown away, carted to the dump and gotten rid of, because it would be in the way. The testimony is that physical conditions at the Eastern Rolling Mill Company were such that they could only load two cars at the loading place at a time. Mr. Hazlett says they have plenty of land, and they could pile an indefinite quantity of scrap elsewhere in the yards, or they could load it on cars and start it rolling on the railroad tracks, if they had a definite destination, and where there was a liability to incur charges for demurrage if there was no market to send them to immediately.

All that by way of preamble, to show how this contract which is the subject matter of controversy, came about, Jones being the head and front of this company, a man whom the Board of Directors had selected to make money for them, a man who was a manufacturer by training and experience, was put in complete charge of the operations of the plant, with the technical statement, "subject to the Board of Directors." The language of his contract is "full charge of the business of the company and operation and control of its plants and of its organization as President and General Manager thereof, subject only to the direction of the Board of Directors of the Company, for the term of eight years accounting from the aforesaid second day of July, 1927." Now, he was president of the company, and in addition to that he was general manager thereof, and in the full direction and control of the plant. He surrounded himself with an able, experienced and congenial organization; the names of its members have been referred to, and amongst them was the head of the sales department, Mr. Hazlett, who has since become a director and successor

to Jones as President of the company. All the sales product marketed by Hazlett as head of the sales department was subject to the approval of Jones. Everything connected with the company was subject to the approval of Jones. Before Jones ever came to this company, and in some of his experiences in other similar lines of operation, I suppose, he had come in contact with the plaintiff in this case, Simon Michlovitz, who is a man described as a junk dealer or a man who deals in junk or scrap. The record shows that he is illiterate in the sense in which we use the term, in that he cannot read or write the English language. He speaks it fluently, but with an accent that makes his testimony difficult to understand, and I think, more or less impossible to fully transcribe. In the fifteen or twenty years, if that be a correct figure—(I have to speak from memory on a good many of these things)—of his contract with Jones in purchasing scrap from him here at this mill, or other mills where Jones might have been connected, where he was in contact with Michlovitz as a purveyor of refuse product of a steel character, he found him to be honest, efficient and upright in his dealings, and prompt in his payments and in the management of his plant and in the moving of the scrap from this plant, Jones, the deceased, as distinguished from the other Jones who testified in the case and who was Vice-President (both having the same names but the testimony is that they were no relation to each other), knew that it was necessary to remove this scrap very promptly. His past business relations with Michlovitz made him not only willing, but glad, to get the benefit of the services of Michlovitz in disposing of this scrap, and he had, as general manager of this plant, from time to time, various contracts with Michlovitz for the prompt removal, disposition and marketing of this scrap, as a by-product, two per cent. of the business of the company, of late. I don't know whether it was that large all the way through or not. At the present time, they say it amounts to two per cent. of the gross receipts of the company, that is the sales resulting from scrap amounted to two per cent.

Now the contract sued on is a five-year contract, part of which has. run, made by Jones as President and General Manager of this Eastern Rolling Mill Company for the disposition, through Michlovitz, of the scrap of the Eastern Rolling Mill Company, at a floating standard, accepting as a basis for it, the quotations in the said to be most reliable journal of its kind published, called the "Iron Age," which has quotations of the various kinds of scrap and metal industries in various parts of the country, and for the purpose of that second hand industry, by-product material, and probably all iron industries, as far as I know, quoted in the "Iron Age," judging from observation of the size of the magazine on the counsel's trial table, a half an inch thick, or larger than the "American Mercury" in appearance and thicker. They take the different markets and the letters written weekly from those markets, indicating the alleged market price in that territory and the various kinds of metals in the steel industry. Pittsburgh is apparently the hub center of this industry, and according to the testimony in this case, there is also another market east of Pittsburgh. In other words, Pennsylvania is zoned into two zones, the Pittsburgh zone, and what is called the "eastern Pennsylvania zone," and the quotations for what is called the eastern Pennsylvania market are reflected in a weekly letter written from an office in Philadelphia, and because they emanate from a desk located in Philadelphia, it has commonly been referred to as the "Philadelphia market." As I understand the testimony, there is practically no Philadelphia market, as such, namely Philadelphia, and that eastern Pennsylvania, within a radius of so many miles from Harrisburg, takes in a number of towns in which steel industries of one character or another exist, and in which, therefore, there is opportunity for consumption of by-products such as the scrap from rolling mills would be.

Now this contract, as I understand it, calls for a five-year term based on this floating standard of taking the Eastern Pennsylvania market as reflected in the letter from Philadelphia in the "Iron Age" on either the character of the metal involved in any sale, or if that particular commodity is not quoted in the Philadelphia letter, reflecting the Eastern Pennsylvania market, then they take the article *nearest in kind* to that, which in this case I

understand to be "bundled steel," with the testimony that bundled steel has a value of about one dollar less than the hydraulically compressed. Is that correct?

(Mr. Poe) That is their claim.

(The Court) Bundled steel, loosely speaking, is said to have a normal value in the market of about one dollar less than the kind of steel scrap produced by the Eastern Rolling Mill, which is there hydraulically compressed into bales of a somewhat larger size, but to those who are familiar with it, it is considered a better product for remelting in the stacks or forge, wherever they put it in, because you can get more weight in a bale of this hydraulically compressed steel scrap in the same number of cubic feet than you can get of more loosely baled scrap that is not hydraulically compressed. On the other hand, there is some testimony that because of the awkward size of the bales of this Eastern Rolling Mill scrap hydraulically compressed, there has been some difficulty, and still is, in some places, in inducing customers to buy it because of the awkwardness in handling it. Those who have handled it, and are familiar with it, apparently prefer it to the other kind, because of its greater weight and more condensed form.

Now the price taken in the contract with Michlovitz and the Eastern Rolling Mill is $3.00 less than this Eastern Pennsylvania market quotation as reflected in the Philadelphia letter in the "Iron Age" fixes bundled steel scrap. The record also shows that there is in the State of Maryland and in this general district, excluding the milling and mining and smelting towns of Eastern Pennsylvania, no consumer for scrap such as the shavings from the Eastern Rolling Mill, except the Bethlehem Steel Company, located not very far from the Eastern Rolling Mill's plant in Baltimore—I don't know whether it is in the city limits or outside. I think the freight rate from Baltimore to what is called the Eastern Pennsylvania section, namely, Harrisburg, and approximately the same to towns in that nearby radius, is approximately $2.27 a ton, and Mr. Vogt, who testified for the defense (out of turn as a first witness) from the Steelton plant up there near Harrisburg some place, Allegheny, said that the freight rate to Lancaster, which is one of the places that consumes stuff of this kind, is $2.50—Steelton, Clayton and Harrisburg, all of those being commonly spoken of as in the Harrisburg district, or Eastern Pennsylvania market.

Now, briefly, that is the background of the situation. I might add this, that after Jones' death last November, the record shows that the present vice-president, Mr. Clark, then a director, at all times a director, learned for the first time of the nature of this contract with Michlovitz, and on that I might go further and state, learned for the first time through whom and where the scrap of the Eastern Rolling Mill was being and had been for years sold and disposed of by Jones as general manager, that in all of his many contracts with Jones, and his conferences with him from week to week, as director, of the big policies of the Company, the question of "scrap" was never mentioned. Jones never mentioned it to him and he never thought of mentioning it to Jones. The fact also remains that Mr. Hazlett, the present president, knew of the fact of there being contracts with Michlovitz by the Eastern Rolling Mills made through Jones for the sale and disposition of this scrap for a period of years, that he during that period of years was not a director and not in contact with the directors, that he was head of the sales agency and that while he did not approve of the sales of the scrap through Michlovitz, at the prices at which they were being sold, and now claims that he felt assured they could have been made to bring a greater amount of money, and I think he went so far as to say, if I recall his testimony, that he several times protested to Jones, the general manager, that the scrap of the Eastern Rolling Mills was being sold too cheap, that a better market could be found for it, and that Jones intimated to him pretty plainly that it was none of his business, and on one occasion told him that he was satisfied with his operations with Michlovitz, Michlovitz had always moved the scrap promptly, and that he had not any disposition to change his policy in that respect. Mr. Hill testified in substance that he was a director from the beginning of this company, and that within about a year after its original operations, its inception, he from that time down to the

present, knew of the fact that the by-product or scrap of this company was being sold by Jones, the general manager, to Michlovitz, and that he, Hill, himself (being a partner with Curzon Hoffman in the same line of handling second-hand material of the steel variety), desired to buy or be a bidder for at least some of the scrap of the Eastern Rolling Mills, and applied to Jones to see whether he could get it, and Jones told him no, that his relations were satisfactory, that he was under contract with Michlovitz and did not have anything to dispose of at that time. Either that was his answer to Hill or it was his answer to Hazlett, when Hazlett told him that someone of the Bethlehem Steel Company wanted to also open negotiations for the buying of scrap. I think that was the time that he told him they were under contract with Michlovitz, and they were not free to negotiate with anybody else.

Now, with that as a basis of the situation, after Jones' death it is contended by Mr. Hazlett and Mr. Clark of the Eastern Rolling Mill Corporation, that this contract with Michlovitz is void, and counsel in the opening statement of defense, divides his contention into three branches or did yesterday, first that it was ultra vires, the corporation itself, or the contract itself was ultra vires, in that it was an abdication of the function of the corporation in the sale of an integral portion of its entity; second, that the contract is void because it is fraudulent in character, but I have never been able yet to quite grasp the exact contention of the defense in this case, as to whether they contend that the fraud is *actual*, or whether it is "constructive," in the purely academic or legal sense, and it did seem to me, though I may be doing an injustice to their contention, that at one time they stood on one foot, and then at another time stood on the other foot, and sometimes on both feet, and sometimes did not stand at all on either proposition, but they may stand on both feet for all I know on both propositions. Taking it up in the alternative, if the contract is fraudulent in either sense, either constructively or actually, their contention is that legally that makes it void, and that therefore it is immaterial which their point of view is, suffice for the day, if it is either, it is un-

enforceable. The third proposition of the defense is that equity has no jurisdiction to enforce this kind of a contract because, for various technical reasons, of adequate remedy at law, and being unconscionable in character, it is addressed to the discretion of the Court as to whether it is the kind of contract equity ought to interpose its aid, and that under either aspect, that having no jurisdiction at all, it cannot act, and ' if equity *can* act, that it is not of the character that appeals to a Court for the exercise of a discretionary authority.

Now, taking up each of those three contentions, because I think they summarize the whole contention of the defense, the first is that the contract is ultra vires in character. I express the opinion that I see no force to that contention. The sale of the by-product is exactly the character of authority that the general manager of a plant, such as this is, would have, not only the authority to *dispose* of it, but the *duty* to get out of the way, as economically and as rapidly as possible, without any more cost in moving it to the company than was necessary to clear.the decks, so that the real operations of the company should go on uninterfered with by litter and dirt around the plant.

The second contention of Mr. Markell is that the contract speaks for itself because of the terms of it and carries with it its own implication of fraud, actual or constructive as the case may be, and that it is not necessary to search the human heart to ascertain what the motives are or what character of sinister action may actuate it, if the thing is so unconscionable in its form as to spell fraud, legal or constructive or actual. Now the contention is that the price at which the scrap of the Eastern Rolling Mill is sold irresistibly leads any reasonable mind to that conclusion that it must spell fraud because there is $3.00 or $3.10 profit. We have taken testimony for two whole days on it after hearing the opening statement and throughout the opening statement and the argument of the defense it seems to me that there is a sort of obsession that the transaction is tainted with fraud, actual or constructive, of such a character as to vitiate it: I am frank to say that, with the exception of insinuations of learned counsel for the de-

fense, I fail to find a line in the testimony of any character or description that would warrant my mind in feeling justified in assuming or believing that there was any actual fraud in the case whatsoever. Now I say that to my mind the record is entirely silent of any evidence, affirmative in character, but with one exception about which I will say a word further on, but on the contrary has nothing but the most direct and emphatic testimony coming from the side of the defense itself that negatives the existence of any actual fraud of any character or description. Now the only person in this case that has undertaken to express an opinion that Mr. Jones, the deceased manager, and a successful operator of this company, who was thought enough of by Mr. Aldred and the board of directors to be given a fifty thousand dollar yearly salary and an eight-year tenure of office and a five per cent. commission on his net profits over and above $475,000 a year, if he made them, the only person that testifies a line on that in the form of an expression of opinion is Mr. Charles E. F. Clark, a director of the Gas Company, the vice-president of the Eastern Rolling Mill, and the president of the Pennsylvania Water & Power Company, and I say now, as I said during the trial, that I was perfectly *shocked* at Mr. Clark's testimony, coupled with the testimony he gives on page 462 of this record, that he had known Jones intimately since 1916, that is a period of twelve years, that he worked with him in the closest harmony, and that he looked up his history and his previous record and his integrity before Aldred and he took him to their bosom in this steel plate industry, and later arranged to take him and capitalize him in the issuing of the stock of this rolling mill, and place in him abundant confidence and plenary power in the management of their large capital and in the free handling and expenditure of millions of dollars of money, and in his close contact with him for years, and in the enormous profits that he made for the stockholders of two and a half million dollars in seven years in addition to a surplus of over a million dollars he never until after he was *dead* had the slightest occasion to suspect his integrity, and Mr. Markell said in argument that Mr. Clark was prodded to the expression of an opinion on Jones' integrity after he was questioned by Mr. Poe and that the testimony he gave did not come from him voluntarily, and I find that to some extent that statement is entirely correct, but with this limitation, that I notice that Mr. Clark had sat in this Court from the beginning of the trial throughout the witnesses' testimony. I did not know who he was until he was called to the stand, but he did hear the opening statement of Mr. Markell which bristled with suggestions of an attack on Jones' integrity, and was prefaced with a sort of apology of the necessity that a lawyer had in the discharge of his duty to his clients, even to the extent of raking over a dead man's bones, if the facts, in his judgment, warranted it, and I am not criticizing the contention of counsel, or the courage that may be sometimes required if they feel it a legal duty. All I am saying is, that in the light of post mortem examination of the testimony, that I think it was a startling injustice to the memory of Jones, and a rank piece of ingratitude by his business associates, for whom he helped to make millions of dollars, and who in his lifetime had never had the occasion to suspect his integrity in the slightest, and in my judgment, Mr. Clark has no foundation for the opinion that he expresses now that he doesn't think Jones could have had anything except sinister or ulterior motives in the making of this contract. I think it is wholly unwarranted by a scintilla of evidence in the case, and I think you have presented here a situation that because you don't know exactly what a man's motives were, or what his policy was in the formation or formulating of a particular contract, that when he is dead and gone and you are unable to ask him why do you think it was wise to make a five-year contract with Michlovitz for the sale of this scrap, when he is not able to answer that question, to impute dishonest motives to him. He may have had a half a dozen reasons for it, but when a man comes into Court under the protection of the Maulsby case in 69 Md. against suit for slander, and says in my opinion it was *dishonest*, I would think that man was a dangerous business associate. I refer to page 480 of the record where Mr. Markell asked this question of Mr. Clark: "Tell the

Court whether in your opinion that was a fair contract to the company in the sense that a person of Mr. Jones' capacity as you knew it could make such a contract looking only to the interest of the company and not to friendship with Michlovitz or any other matter? A. I don't know that I get your question. The Court: Do you think that Jones had ulterior motives? The Witness: I cannot have any other thought than that there was an ulterior motive. The Court: Why? The Witness: Because it was not consistent with the years of relationship that I had with Jones and to my knowledge of his keen ability to trade and his knowledge of the affairs of business. Regret it as I do I have that point of view." Then Mr. Poe took him up there and asked him did he consider that his motives were dishonest, and he said possibly, and then he got more courage and said, Yes.

Now it has also been contended, or hinted at, or insinuated, that these other contracts that were in the nature of five-year employments made by Jones with Hazlett, the head of the sales agency, and two or three other members of his organization whose names I cannot recall, that they were unwarranted as far as legal effect goes, that Jones had no authority to make five-year contracts with officers because they were only elected for a year, in the absence of the Board of Directors, and that therefore he was recreant to his trust in not looking solely to the interests of the stockholders of this company, and that he was generous in providing for a five-year contract of employment for the sole benefit of the employee in the event of his death. In other words, the implication is that he made the contract with his organization, so that if anything happened to him, they could hold the company responsible on their contracts for their salaries, $9,500 in Hazlett's case for five years, but that they were ineffectual, legally, and not binding on the company. In other words, that they were only one-sided, they could not be enforced against the company, and the company could not enforce them, and that therefore there is the inference that that was only another evidence of Jones' big-heartedness or non-loyalty to his company, and the defense put in the certified copies of the by-laws of the company, over the objection and exception of Mr. Poe to their admissibility. The by-laws provided that the directors could make terms of employment contracts with their officers for periods exceeding the year for which the officer was elected. In other words, a very special and unusual provision, that by resolution of the Board of Directors these contracts which Jones made with Hazlett and the other organization, could validly be made for a period of five years or more, but, if made by Jones, without the Board of Directors, they were nugatory as far as being legal and enforcible. Now who knows, who can determine what the policy of Jones was in doing that? It doesn't take much ingenuity for anybody to see that you can make a much stronger argument in favor of the *absolute loyalty* to the corporate interests of the Eastern Rolling Mill, *as reflected in this particular transaction*, from the action of Jones. You could easily conceive that he felt the best interest of this company required the building up of an esprit de corps among the sales agencies, that the best interests of the company's sales can be conserved by solidifying that organization, and tieing the "key men" to the company for a period of years in advance, five years. The record is in this case that after making the contracts in writing for five years with them, as soon as one year would expire, he would *renew* it so as to always have it five years in advance. Hazlett, the new president, comes in and sort of sneeringly says he did not want the contract, that Jones sort of forced it on him, and that he took it because he did not want to offend him and that he signed it, although it did not mean anything to him. But you can very easily argue how very wise was the policy of Jones, to have those key men signed up, over their own signature, that they contracted to stay with the company for five years in advance, and for a definite salary. Two reasons suggest themselves to me, one, to prevent them when they got a swelled head, if any of them did, to have them tied down by contracts so that they could not say, if you do not give me a raise of salary I will quit, and at the same time to be equally free to raise their salaries, as Jones was raised by the company itself, whenever he thought their services were worth greater salaries. Second, you cannot

read the cases in the law books without realizing the fact that in all organizations of this kind one of the important things is the organization, and that the good will of the business can be taken away by men who leave that employment, and undertake to take with them their customers, and their routes, etc., and the secrets of the trade, and their prices. By having each one of these men, like Hazlett, tied down to a written contract, for five years they could prevent them from getting away, and taking employment with rival mills. If it came to a question—and this is what I think is the force of the by-laws that Mr. Poe objected to—I think the by-laws one of the strongest pieces of evidence in favor of his side of the case, and he was about to shut it out, that at any minute Jones knew after he had all these people signed up, that they were bound and whenever he wanted to make it binding on the company, all he had to do was to call a quorum meeting of the Board of Directors, and have the contracts approved and ratified, and then they were absolutely legally enforcible, and the company could go into an equity court and enjoin any one of these employees from taking employment in any competitive enterprise, and it seems to me that Jones performed there a wise, shrewd action, solely in the interests of the stockholders, but also that may have had an advantage to the individual and that the contract would have been binding on both sides and beneficial on both sides. Now because Mr. Clark or some one else who cannot see what motive Jones might have had in the policy of sale of scrap and impunes his motives and integrity, it seems to me is a poor excuse when the man is gone, and you cannot ask him what his reasons were, to question his honesty. L. J. Jones testified that in conversation on more than one occasion with the deceased Jones, when they were talking about scrap contracts, J. M. Jones let fall to him an intimation of his reasons for this policy and said, I do not think it is good policy to tie up the sale of your scrap with the steel company that you are buying your bars from. Now that was Jones' thought. Some of the new operators who think they are wiser in their generation than Jones was, think differently. This man Voigt from Steelton undertook to say he thought it was criminal not to sell the scrap to the Bethlehem Steel Company, and he also undertook to outline a policy for the Bethlehem Steel Company, and undertook to say he thought it was the height of folly for the Bethlehem Steel Company not to insist on buying the scrap of a customer in the territory where they were selling their goods. Jones thought it was *not* good policy, and I must say from the testimony that Hazlett gave, I can see the force of Jones' point of view, and I can see the folly of the thought that the present president of the Eastern Rolling Mill has as to how he could more advantageously sell the scrap of this company to the Bethlehem Steel Company, by making them take his scrap, on his terms, and adopting a policy of retaliation against them if they did not do it. He said if they did not take his scrap, on satisfactory terms, that he could hold up the purchase of steel bars from them, and when Mr. Clark, a much wiser and more experienced mill operator, says that the very actuating motive for establishing this rolling mill in this locality was because of the close proximity to the Bethlehem Steel Company, and because of the easy market at which they could get the steel bars, whereas if they undertook to interdict the purchase of them, to use it as retaliation, they would have to pay five dollars and some cents freight rate to get the bars from the nearest market, which would be Pittsburgh.

Mr. Markell contends that the $3.00 freight rate differential, at least the contingent differential of $1.00 in difference in grade brings the case in the category of "constructive fraud," if not actual fraud. It seems to me that that argument is not sound, because it is not based on the facts. There is no $3.00 profit in this contract, except contingent, and possible only under favorable conditions, and subject to the duration of those favorable conditions, and that is limited to the sale of the product to the Bethlehem Steel Company in this territory where they would not have to pay $2.27 freight rate to the Eastern Pennsylvania market, but no man could sanely contract for the purchase of the entire output of a plant in this locality where he would be dependent on one customer and if that customer did not take his goods at his price, he was "stuck," and if he wrote a contract or underwrote a contract, to handle this scrap daily on a price that he could

not conservatively get it to the Eastern Pennsylvania market, other than Bethlehem Steel Company down here, which is the only possible purchaser in this whole State, why he would simply be out of pocket for his work. Then, second, it is contended that if $3.00 is not the natural and normal profit that at least the difference between the freight rate to Philadelphia, taken off of that, $2.27, would leave 73 cents plus the dollar differential in character of hydraulically compressed steel scrap, as against the market for baled steel, would leave $1.73 profit, and that that is an "unconscionable and exorbitant figure," and therefore that also spells fraud, in legal effect. Now the answer to that, I think, is first of all, in my judgment, that profit would not spell fraud at all, and that that profit would not be more than a fair and happy profit for a man to make in this line, and would be subject to many contingencies that would not leave it by any means a certain profit, even if it were successfully obtained in many repeated transactions, but that as against that you have to toll off the additional freight rate that may have to be paid, if you did not find a ready and immediate market, at the first shipping point of which $2.27 would be the terminus of that freight rate. If you had to divert it to Lancaster or some of the other towns, in that market, or if by chance you had to send it on to Pittsburgh market, your entire freight rate would eat up the profit. It is idle to say there are no hazards in the junk business. If there were none, everyone would be in the junk business, I mean in the scrap business. There is no business that there are not untold hazards. You might say look at the enormous profits that the Eastern Rolling Mill has made. Their profits could be wiped out by a non-experienced salesman, if they did not have a good man like Hazlett is to market their product, and if they made improvident contracts, their dividends and hopes of dividends would disappear over night, and there is not any business that is not full of such hazards. Therefore, it seems to me, that it is idle to contend that the possibility of getting $3.00 profit from the Bethlehem Steel Company, and the successive getting of it in many instances, and for certain periods, is by any means a standard to expect that it can always be gotten,

and under all circumstances. It seems to me the argument is perfectly idle to say that the sales should always be made direct from the Eastern Rolling Mill to Bethlehem Steel Company, and anybody with knowledge of the economic conditions of business, would know that the minute the intermediary scrap man is eliminated from this market and the Eastern Rolling Mill found themselves in the position of having to dispose of their own scrap, and required to find their own market for it, they might naturally turn to Bethlehem Steel Company as the nearest consuming plant as the one and only place they could inquire of, and they would find very promptly, unless it be done purely on grounds of friendship and because they are a favorite customer, as Mr. Clark described them, and I have never seen favoritism go very far when it comes to business of that kind, that they could expect business competition and dickerings. Certainly the favoritism and friendship of Clark and Jones did not go very far in maintaining their confidence in each other when he saw the possibility of raking in a few extra dollars for his company at the expense of Jones' reputation and integrity. It would not go very far in inducing the Bethlehem Steel Company to say. you are stuck with your scrap, you cannot get it to the Eastern Pennsylvania market without paying $2.27. We do not propose to pay you what we testified we would in this case, and I do not believe for one minute they would pay the Eastern Rolling Mills the figure quoted in the "Iron Age" in the Philadelphia letter for delivery of the scrap from the Eastern Rolling Mills to the Bethlehem steel plant, because the first thing they would say is, you cannot get it to the Eastern Pennsylvania market where that price is quoted, unless you toll off $2.27 freight rate, plus any other extra expense you might have in handling it. I am not going to let you make that $2.27 profit yourself. You will have to divide that with us and we won't pay you Eastern Pennsylvania market. We will pay you thus and so, take it or leave it, and if they don't take it—they would squeeze them —I think they would probably try to squeeze them down so that they could make all of that figure if they could, or as near all of it as they could get, and if they did not take it they would

say, go ahead and market your scrap to suit yourself. Then the Eastern Rolling Mill Company would have to establish a department for marketing its scrap. They would therefore have to keep books on scrap, on shipments, on consignments, and have to have the refusal of cars, law suits and all of the petty dealing that goes with every commercial transaction that involves the welching or dickering of its customers. Now might not we well say that it was a wise policy of Jones to divest himself of all of that outside nuisance, all of the possible law suits and the time consumed in Court in testifying on contracts made for the shipment of scrap to Harrisburg and Altoona or Pittsburgh and Lancaster and different places, and to be relieved of all that annoyance, of all those law suits, of all the necessity of daily finding a market for it at a market price, and selling it and collecting for it, and then having to enforce obligations afterwards in collecting the bills. The testimony in this case is from Michlovitz that Jones said to him: Michlovitz, the Eastern Rolling Mill Company is not in the junk business; we are in the business of making steel plates. I know you make a couple of dollars a ton when you sell it to Bethlehem. I don't care. What we want is service. You have never fallen down on the movement of a car, and have never been a day late in the discounting of your bills, or never failed to have shipping orders for a car whenever we had it for market. And Jones thought that service was worth something to a company, and that it relieved Jones of a lot of detail and left his time and mind free to put his talent and ability on the ninety-eight per cent. business of that company, with the result that he made two and a half million dollars dividends for them in the administration of his policy, and over a million surplus. You have had the whole staff of officers of the company in Court for a week on this junk contract. This is just an illustration of it. Here is a little junk contract that it seems to me there is no excuse in the world for the company not to live up to, except the inordinate desire to make a little bit more money by the breach of their own contract, and if there is any dishonesty in the case, the dishonesty is the corporate dishonesty of the Eastern Rolling Mill Company, and their officers, only in

their capacity, in not living up to the contract that their representative clothed with plenary power to make, did make. It seems to me they had no right to undertake to welch on their contract, and I think there is a good deal of force in Mr. Poe's argument that even from a purely technical standpoint, to say nothing of the morality of it, they are estopped by their own action, by their own recognition of the contract, by the testimony that L. J. Jones gave on page 176 of the record. He said after they withdrew their negotiations on both sides that the statement was made that the contract runs along and both sides assented to it and that they shipped under it after that, the Eastern Rolling Mill Company still hoping that sooner or later Michlovitz would come in and they would persuade him to enter into some modification of the plan or make some substitution. My recollection is on the first day of the testimony there was a letter offered, I think it was Exhibit 14, or something like that, a letter signed by the present president of the company, and recognized the shipment of a certain number of cars to them under this contract, and it seems to me that would be a clear estoppel on the record that any contention of the present officers or Board of Directors that they were not perfectly familiar with the terms of this contract, and therefore it does not make a particle of difference whether they knew the terms of it or not. Hill from the very first knew Michlovitz was the party to whom the scrap was sold, and what information he had on the subject was imputable to the rest of the Board, and if there was anything that required any Board action, which I feel confident there was not, the Board would be estopped by the knowledge of a member of the Board of the fact. For all of which reasons and for a variety of other reasons I think the agreement should be enforced. One very technical reason which Mr. Poe mentioned in his argument and addressed to Mr. Markell's third proposition, on the question of equity jurisdiction, seems sound. Mr. Poe emphasized the fact that some of the contracts that Michlovitz had, and which are offered as exhibits in this case, call specifically for "scrap of the Eastern Rolling Mill Company," and that therefore, as to those, there being no other agency in the world that

could supply that scrap except the Eastern Rolling Mill Company, that that of itself, and standing alone, would be sufficient equitable grounds to have the Court decree specific performance as to the very identical articles which can only be obtained from this defendant for the purpose of meeting those contracts. Assuming that to be so, it is an accepted proposition of equity, found in Pomeroy's Equity Jurisprudence, Section 181:

"Where plaintiff is entitled to equitable relief, equity on taking jurisdiction will, to avoid multiplicity of suits do complete justice although in doing so it may decree on matters otherwise cognizable at law."

So that even on that technical ground, although I do not want to base it on that alone, although I think it is sound, that would be jurisdictional. Equity jurisdiction having attached for that purpose, to decree performance of that which can only be gotten from the defendant under this contract, it can, as Pomeroy indicates, proceed to do complete justice between the parties. I think the answer is very well put, that the *uncertainty* of the measure of damages, and the *difficulty of ascertainment* in a Court of law, and the *uncertainty of the market*, where the particular product would have to be found and marketed, and the inability to ascertain what would be had in a given time, the market in these particular localities, because you could not tell—if this suit had to be enforced at law, that is when they would have a car and when it would be ready for shipment and where it would have to go and where the man who got it would in fact market it, makes the remedy at law inadequate. He might market it at Bethlehem Steel Company and get $3.00 for it, and he might have to run it to Harrisburg and get nothing, and he might have to run it to Harrisburg and get more than the market for it  I think the market is very unascertainable as to what it would be, and I cannot see any necessity why they should be put to a multiplicity of suits on it. I cannot see any equity in a man not living up to his written contract. In any event I think the policy of equity is to enforce fair contracts and that is my disposition in this case.

A further word on Mr. Markell's propositions about the inadequacy of

prices as a ground for fraud, I think this English case that I hurriedly picked up in the Bar library this morning, is a complete answer to that contention. The case of Griffith vs. Spratley, 1st Veazey, page 382—unless the disparity is so gross as to shock the conscience of a Court and because of extent of the shock to imply fraud. That is his contention. It is good law, but I do not think the facts come within a mile of this case.

I understood Mr. Markell to contend in argument that a five-year contract or any contract beyond the tenure of the directors which is assumed for the sale of products or by-products of a company was practically an unheard of thing, or so unusual that a diligent search of authorities failed to reveal a case where the intervention of the Court was sought to enforce such character of obligation. This not squaring with my limited knowledge of business operations in the industrial world, I made a hurried examination for an hour before Court today in the Bar library.

Even a superficial hurried search revealed three such cases, one in Maryland and two outside.

Diamond Alkali Co. vs. Thompson Co., 23 Fed. (2nd) 515, is one where a concern agreed to buy all its raw material for a period of five years from one company and claiming the company had no right to retire from business by sale or otherwise pending the existence of the contract (contention not upheld as continuing in business was not contracted for), but it was a five-year contract. The second is White Marble Lime Co. vs. Consolidated Lumber Co., 172 N. W. (Mich.) 603, which was a fifteen-year contract renewable for ten additional years, to sell and deliver to the Chemical Company all its cord wood and slabs (a by-product of a saw-mill) at $3 a cord. The case was too long for me to digest in a hurried reading this morning, but from it I take the following extract:

"That the plaintiffs' remedy at law is not adequate is plain. The limited nature and uncertainty of the market; the necessity for going into other markets where competition is keen for a supply, the inconvenience and labor of finding a supply; the disarrangement of the plaintiff's business and calculations for the future, the impractica-

bility of determining the damage accurately, and the multiplicity of suits which would be necessary to obtain a recompense, render the situation one which can not adequately be compensated at law."

The third case was Zeilin vs. Frank Steil Brewery case, in 131 Md. 582, where a ten-year contract existed by a customer to purchase all the beer for his saloon from Frank Steil Brewery. The suit was not one for specific performance. The saloon man had died and the property was held by the entireties and his wife wanted the contract cancelled and the property reconveyed which had been pledged as security for money lent in the performance of the contract. Her bill was dismissed, thereby inferentially upholding the validity of the contract. My point is as to the *fact* of such term contract being ordinarily made in *business operations.*

There was no *secrecy* about the making of the contract for the sale of this scrap (the steel shavings which accumulate in trimming the bars). Mr. Hill, the director who wanted to buy it, or some of it, knew of it almost from the very beginning. Mr. Hazlett, the new President, testifies on page 411 that a copy of the scrap contract with the complainant was lying in his desk so that any of the clerks who worked there had access to it to make up their computations of the sale of the by-product. The book entries no doubt carried every debit and credit with the complainant. How complete the book records are on the subject is abundantly apparent from the compilation Mr. Markell has been able to make during the trial, as to every ton sold, when, where and for how much. The books were always accessible to the directors and to their Auditing Committee or to the professional auditors.

I think the answer to the whole "obsession" Mr. Markell seems to have regarding the alleged "dishonest" character of the contract for the disposition of this by-product is clearly found in the testimony of Mr. Hazlett, the present president of the company, and who was then head of the entire sales department, and through a period of years was probably more closely, daily and intimately associated with Mr. Jones in the conduct of this business, than any other person.

"Q. (By Mr. Poe) Do you want the Court to understand you think it is a crooked contract? A. No, sir.

"Q. You want the Court to understand it was an *honest* contract, but a *mistake* of judgment? A. Yes.

"Q. Is that the position you want the Court to draw from your testimony? A. Yes.

"(The Court) In other words, you think you can get a better price for it, isn't that it? A. I do."

This, I think, is what is at the bottom of this whole case and the secret of this entire litigation. The new management (by what I think is a shortsighted business policy), has conceived the idea they can play 98% of the business of the company against two per cent., and force a better price on the sale of this waste or by-product of steel shavings, and can force the Bethlehem Steel Company to take it *on more favorable terms* (or they can refuse to take their steel bars if they don't, although they can not buy bars elsewhere nearer than Pittsburgh, with over a five dollar freight rate to Baltimore). To make either temporarily or permanently, as time alone can tell, a little better margin of profit on the sale of scrap, with all its attendant difficulties and risks, *avarice* alone, as it seems to me, prompts them to break their formally-entered-into *written* agreements. The present reversal of the policy of Jones is responsible for nearly the whole executive force of the Company being required to sacrifice their time for four days in the trial of this case, disturbing many heretofore pleasant business relations, responsible for the most astounding testimony of Mr. Clark, its Vice-President, the echoes from which will long be felt in their future business operations; besmirching, without the slightest legal justification, the memory of the deceased Jones, who gave the best years of his life to the production of enormous dividends for everybody connected with this Company. The antagonistic hand of the Bethlehem Steel Company is to me abundantly apparent in this case. They are the ones who want to reach through the paper writing, evidencing the Jones Michlovitz agreement, and grasp the by-product for which they *now* have use. As soon as the scrap broker, or middleman, is eliminated, they will begin to "dicker"

with the Eastern Rolling Mill, and drive a hard bargain for the sale of scrap, when they know the Mill can not get it to any other market nearer than eastern Pennsylvania at from $2.27 to $2.50 freight rate.

Mr. Clark on page 475 of the stenographic record describes this defendant company as "preferred customer" of the Bethlehem Steel. Whether a reversal of the Jones policy on scrap and the feelings that have been engendered throughout this trial, due to the repudiation of its written contracts, will disturb that preferential position, remains, of course, to be seen. There is much reason for believing that the policy of Jones was a wise and profitable policy for the company to pursue. The departure from it in this case has caused some of its officers to "see red," and created "obsessions" for which I find no foundation in fact. I cull a line from 15 Harvard Law Review (picked up on my hurried examination at the Bar Library this morning from 9 to 10 before the opening of Court). Whether taken from the case cited under the text, or whether supported by the case, I know not. There is sufficient wisdom in it to stand on its own originality, if such it be.

"An apparently conclusive argument against equity refusing specific performance on the ground of mere inadequacy of consideration is the practical impossibility of the Courts weighing numerous motives which may have actuated the parties in the making of the agreement, citing Griffith vs. Spratley, 1 Cox 383.

Again in Cole vs. Trecothic, 3 Vez. 234, at 246, it is said:

"The common law courts will not examine into the inadequacy of consideration, so equity will not refuse to enforce a contract because the consideration is inadequate, provided the parties when entering into the agreement, stood on even footing, and the element of fraud was absent."

And our Court of Appeals in the Gottschalk case in 69 Md. 51, cites with approval the Wilson vs. R. R. L. R., 9 Ch. Ap. 278, that performance, instead of damages, will be enforced. only "where it can by that means do more perfect and *complete justice.*"

I think that is exactly the situation here. To my mind this contract is fair, just and wise, from the standpoint of both parties; freely entered into, by parties who stood on equal footing, and that all fraud, actual or constructive, is *wholly absent*, and exists only in the imagination of the defense who have become "obsessed" with an idea for which I find no foundation in the evidence, and no justification for its expression.

I will sign a decree enforcing the injunction and specific performance of the contract, and if the decree is drawn, under I think it is the Act of 1900, and specifically states in the decree that the appeal shall not stay the execution of the decree, I will sign it in that form. Delay in the continuance of this contract should not be had by defendants.

(Mr. Markell) Do you refuse us a supersedeas to get the decision of the Court of Appeals?

(The Court) I will sign the decree indicated, refusing to stay the execution of the injunction. You will have to deliver your goods under this contract until the Court of Appeals says otherwise. Your appeal is, of course, open to you.

(Mr. Markell) That is an extraordinary exercise of discretion. I never knew a case where the supersedeas to the defendant was refused.

(The Court) What would the statute have been passed for if it was not intended to give that authority?

(Mr. Markell) It gives the authority. I never heard of it being exercised under such circumstances unless a defense is purely vexatious or is prosecuted for purely dilatory purposes. I never heard of a bona fide appeal being——

(The Court) Where are you hurt by it? You are only living up to the contract.

(Mr. Markell) If you assume the case is going to be affirmed.

(The Court) If you are not entitled to it all you have to do is to get Michlovitz to account to you for profits on given cars.

(Mr. Markell) That is whether he gets it from us or we get it from him. The question of damages, exactly the same difficulty for us if the Court of Appeals decides in our favor, there is the same difficulty in determining what we lost as in determining what Michlovitz would lose.

(The Court) The case doesn't make any appeal to my conscience. In my judgment, and of course I may be entirely wrong, there is so little excuse for the breaching of this contract that I cannot for the life of me see why they hesitated about performing it. I think the contract is fair. I think it is wise, and I think it just, and I do not think that the profit is unreasonable, and I think the policy suggested by the company of what they would do now, is either begotten of ignorance or avarice, or *both.*